All righty, we'll go to the first case. Johnson v. Lamas. Mr. Radofsky. It is the court, David Radofsky, for the appellant William Johnson. I'd like to reserve two minutes for rebuttal by Judge Fuentes. Yes, sir. Following a trial in which Mr. Johnson was acquitted of first degree murder, and the jury hung on third degree, the evidence of the second trial differed in only one central and dramatic way. The prosecutor of the second trial repeatedly introduced into evidence the convicted codefendant's out-of-court accusatory statements against Mr. Johnson without any opportunity for cross-examination, and did so with the knowledge that the codefendant would invoke his Fifth Amendment right against self-incrimination before the jury. Based on these facts, the Confrontation Clause violation is conceded by the Commonwealth. The related due process violation for calling a witness, knowing that that witness will invoke the Fifth Amendment, is also established on this record. Do you know if the prosecutor was aware that Slaughter was not going to be presenting testimony? Well, of course, whether the prosecutor was aware at the first time he was called, we think he was, and you can see how the record progresses here, and I will get to that. Mr. Slaughter was called four different times. He was called after his lawyer was brought into the proceedings, and his lawyer told the judge he would not testify. Slaughter repeatedly told the judge he would not testify. He said he would not answer questions from anybody. Before the jury, how many times? At least three times. At least three times Slaughter invoked his Fifth Amendment right or refused to testify before the jury. And beyond that, even beyond that, piling on, what the Commonwealth did was not only call the detective to read his statements as well, but perhaps most damaging, the prosecution was allowed to read into evidence that part of the sentencing proceedings, in which obviously he wasn't even represented, Mr. Johns was not even represented, but recall mid-trial they tried to coerce Mr. Slaughter into testifying by re-sentencing him. And at that proceeding, the prosecutor, kind of the cream on the top of the cake, said that the co-defendant was trying to undermine the truth-seeking process of a Commonwealth to bring some justice. That's what the prosecutor said. And the judge allowed, not only allowed the jury to hear that, but that was an exhibit. That was actually an exhibit at trial. It was interesting to me because in trying to assess prejudice, when you look at the statement that Slaughter gave in the jury's presence, in some parts he was actually exonerating him. The Commonwealth does make that argument, Judge Fuentes. The Commonwealth says he was actually helped. I think it's somewhat ironic that the Commonwealth takes that position when the prosecutor at trial so insistently, so insistently, repeatedly, persuaded the judge to have him testify, knowing he would not be subject to course examination, made it a major focus of his closing argument. The defense at trial obviously was desperate to keep it out, and now the prosecutor says, well, it actually helped him. The fact is they should not have heard, the jury should not have heard the accusatory statement, nor should they have heard the angering, the andering response that he gave. I can't disagree with that, but on a number of occasions, on the harmless error issue, he did say, Slaughter said, we didn't have anything to do with it. We did nothing. Essentially we got railroaded into this confession, or he did, and he exonerated Johnson. But without any course examination by the defense, he would not submit to any questions by the defense, and you've got to understand at this point, here's a convicted co-defendant who gives a statement to a detective following his trial, specifically pointing the finger at Mr. Johnson. He's then called and repeatedly is brought into the courtroom to try to explain. He gives these meandering, angry responses, which only can convince the jury, this guy's changing his story to help his friend. No chance for course examination. Whatever use we might be asked to make of that as applied to the confrontation clause violation and ways that may have exacerbated it. When it comes to whether or not there was a stand-alone due process violation, to that we need to give epidefference unless it was an unreasonable application of clearly established federal law. Right? So that's the question, and the only Supreme Court case that even comes close that you point us to is NAMIT, which hardly seems to clearly establish a stand-alone due process violation. So I think two responses, Judge Goss. Number one, obviously there's no difference to what the Superior Court said because they never reached the issue of the Fifth Amendment. Instead it was excused by the ignorance. It's not only NAMIT, but it's Douglas versus Alabama, which on its facts is very close to this case where you had a confrontation clause violation and you had the invocation of the Fifth Amendment where the prosecutor knew it, and what the Supreme Court said, although they didn't say it was an independent due process violation, they said that added critical weight to the prosecution's case, which obviously goes into the harmless error analysis. Isn't your stronger argument here the Brecht and the harmless error? Absolutely. This case doesn't stand on the independent violation of the due process clause. You've got to consider its impact one way or the other. But whether you find it or not, and Tadaro in this case, I think we have more than, sure, the Supreme Court didn't say it, but I think they said it in Douglas versus Alabama. So let me, if I can, address, because this is a unique case in some ways, every factor that this court and other courts of appeals in the United States Supreme Court have looked at in determining whether it's harmless error or not weighs in favor of Mr. Johnson. First, the extent and the significance of the violation. This was not an isolated or inconsequential event. It was central and pervasive of the prosecution's case, the repeated calling of the co-defendant, and it became, and courts have looked at this, this court looked at it in Grant versus Lockett, it became a major focus of the closing argument. So courts have looked at how much time was spent at trial, how much evidence was introduced, and how much did the prosecutor focus on that point in the closing argument. Before we look at the evidence, can we agree on what framework we ought to be using? Because your supplemental brief makes reference to Brecht and that we might leapfrog and should just be applying a Brecht analysis. After Davis v. Ayala, it seems that any court of appeals that does that does it at their own peril without engaging in analysis first of whether it was contrary to or an unreasonable application of clearly established federal law. That is, even the harmless error analysis itself. Do you argue that the application here was contrary to federal law? That is, there's no reference to Chapman reasonable doubt standard and there's no reference or analysis using the Van Arsdale factors that you're now making reference to. So should we be thinking of this as a contrary to case, and have you preserved that argument? So it's both. I think it's both prongs as to why. Number one, there is no deference if you find a Fifth Amendment violation for the Fifth Amendment because the Superior Court never reached that. Secondly, the reason there's no deference, there are three reasons there's no deference, that's one. Second is the Superior Court did not do a cumulative prejudice analysis that would have taken into account the Supreme Court's direct admonition in Douglas v. Alabama. When you have both of these, then it's critical weight to the prosecution's case. That analysis was never done. Therefore, there's no deference. And then as we made clear, I think, in our letter brief on Ayala, even though the Supreme Court said, yes, there's a deference, when there is a finding in the state court of no harmless error, you don't have to go there. You can if you want, but it's subsumed. The deference is subsumed in the breadth analysis. In fact, that's what this court did in Washington just a few months ago. Well, that's what they said in Friar. They used the word subsumed. But to my mind, that was a bit sloppy, and that's the entire reason that Davis comes out the way it does. They say that we held that the Brecht standard subsumes the requirements, et cetera, et cetera. And then it says, while a federal habeas court need not formally apply both Brecht and Edputt Chapman, Edputt nevertheless sets forth a precondition to the grant of habeas relief. So while on the one hand you might say, well, they previously thought that Brecht was a higher standard than Edputt, now they're making clear that Brecht needs to be resolved, but you need – there's a precondition here of looking at whether it was unreasonable, and you have to address what the state court did. Is that correct? And clearly unreasonable. If we're right that Brecht standing alone is violated, then absolutely, by definition, the Superior Court decision that there was no harmless error was unreasonable. Well, that's exactly what they said in Davis isn't correct. But I think that's what they did in every court that's looked at it since, including Washington, this court. I mean, they specifically said in the Ninth Circuit you can't just do that. You can't look at Brecht on your own. You have to then say, was it unreasonable? Judge Rendell, it also said you don't formally have to. You don't formally have to make that finding first as to deference. But even if this court wants to address that question first. Well, even first, second, it just has to be addressed. I mean, we can say Brecht, substantial and injurious. Yes. But on the other hand, the Superior Court said, well, you know, we have these two eyewitnesses. We have the ballistics report that clearly supports those eyewitnesses. You know, cumulative, they referred to Jones, they referred to cases that talk about harmless error. You know, reasonable minds could disagree. And I suggest, and I'll get back to our factors, why reasonable minds cannot disagree. If you look at Brecht and say this was injurious and substantial, that by definition means that the Superior Court ruling was unreasonable as a matter of law under harmless error. Is that so clear anymore? I mean, I think Judge Rendell's question is going to how do we now think about which is actually the stricter standard? Because it used to be with O'Neill that we could think about Brecht's actual prejudice as a judge in equipoise. And that would seem to mean that a fair-minded jurist might disagree. We now have Ayala saying very clearly that the Edward Chapman standard is no fair-minded jurist could agree with a district court. And my basic submission to this court is given the centrality of this evidence, given the dual violations, the fact that the Superior Court did not do the cumulative analysis prejudice test, they did not consider harmless error at all with respect to the Fifth Amendment violation. But even independently, if you only look at the Confrontation Clause violation, and I want to get to these five factors here as to why I think this is so overwhelming. And when you compare it to your previous cases, Washington, Adamson, Vasquez, the violation here is even more substantial and the commonwealth's remaining evidence is even weaker than every one of those cases in which you found Confrontation Clause violations before with no harmless error. But are you advocating that as we think about the analytical framework for this, that we don't need to go through an Edward Chapman analysis, that there's some other way that we can consider, as the Supreme Court said we have to do, the state court's opinion? I would say two points. As I read Ayala, the court said you don't formally have to make that first step. You can't. But in either event, it said you don't formally have to do it, and the Ninth Circuit has said that, the Seventh Circuit has said that since that time. This court in Washington just three months ago did the same kind of analysis. It didn't do a formal look first as to deference. But even if the court does, this finding was so contrary to harmless error analysis. Remember, on direct appeal, it would be harmless error beyond a reasonable doubt. That's what the commonwealth had to show. To say that there was harmless error beyond a reasonable doubt on this record defies what went on in this courtroom, not only because the prosecutor made it a central part of its case, made it a central part of its argument. As every court has also said, repeated intentional violations. Our standard is a little more relaxed than harmless error beyond a reasonable doubt, isn't it? No, what I'm saying, on direct appeal in the state court, the test was because it was a constitutional violation. The prosecution had the burden on appeal. Once the prosecution conceded a confrontation clause error, the prosecution on direct appeal in state court had to show beyond a reasonable doubt that the error was harmless. That's my point. Given that standard, to say on this record that the commonwealth was able to show that and that the superior court was correct or we defer the superior court's determination that that was correct, defies what went on in this trial. We had, yes? We can get you back on your red lights. Can I ask a side question? It has to do with the phone conversations between Slaughter and Johnson that were admitted from when they were in prison. Do you know where, do you have access to those? They were referred to in the closing of the prosecution. And to my mind, they were faking it. They were planting, you know, oh, well, of course we weren't there. You know, a lot of conversation that, according to the closing of the prosecution, sounded like, you know, any juror listening to that would say, you know, these guys are just making this up as they go along. I've tried to find them and I came short of contacting them. I don't have either. I don't know where the prosecutor was during that time. I almost contacted Judge Meinhardt to see if he had them because we can't find them. And to me, that was an interesting and critical decision. If I may, just a moment, Your Honor. I just want to pinpoint those other points. There was repeated and direct violations. This court and other courts have said an objective factor in determining whether it's harmless error is to compare the two records of the two cases, as I mentioned before. When the Commonwealth proceeded without the out-of-court statement and without the Fifth Amendment violation, they couldn't secure a verdict. Is there any authority on the circuit to support that? I mean, you point to Ninth Circuit authority that that's a relevant consideration. Second Circuit just said it this summer. Second Circuit said it as well. It's a relevant consideration. It's probably the one objective factor you could look at. You did provoke another question because you did say that this statement was central, central, maybe one of the most important pieces of the government's case, but there was other testimony in the case. Owens and Williams were eyewitnesses. Both testified on two separate occasions. And let me just talk about the eyewitnesses for a second. They were impeached thoroughly. They both said they had a many-second look from up to 600 feet. The main eyewitness at the second trial was even weaker on course examination. She said, you know what? I'm not even sure. But nobody put slaughter at the passenger side, and the ballistics evidence clearly indicated that that's where the gunshot came from. The ballistics evidence showed what happened at the car. It didn't show anything about identity. The issue in this case is that nobody's disputing that whoever the shooters were were right around the car. Where the bullet went. Where the bullet went through the arm and through the cavity. That's right. But that doesn't show it was Johnson or Slaughter who were involved. Slaughter only knows about what was convicted. It doesn't show anything about Johnson. Slaughter made a mistake in his statement and corrected it to say that it was Johnson who was in the passenger side. But Slaughter's statement was uncourse examined. They conceded the confrontation clause error. I mean, to the extent the court has to rely on anything that Slaughter says, I think proves our point. That correction was actually made by the police officer, not by Slaughter, at least as far as the record indicates. That's right. Okay. Thank you, sir. Ms. Kiefer. Kiefer or Kiefer? Kiefer. Thank you, sir. May it please the Court, my name is Catherine Kiefer. I represent the Appellees in this case. As counsel indicated, William Johnson is a Pennsylvania prisoner and he and his cohort shot and killed an off-duty police officer after that officer bothered one of their drug customers. I'd like to start by going over some of the factual indications that counsel here suggests make an enormous difference in a finding of whether or not there was prejudice. Ms. Kiefer, could I focus you at the outset again on just how we should go about thinking about this case? Because in your brief, you focus us on Edgar Chapman deference. But you note in a footnote, I think astutely, that it makes sense also to think about the question whether this was contrary to clearly established federal law. And you argue that the state court cited T. Jones, which cited Wharton, which cited J. Neville, which sort of four layers down relies on Chapman. Don't we have, though, a much more fundamental problem here in that, number one, there's no reference to Chapman or to the reasonable doubt standard? Number two, and perhaps most significantly, there's not a reference to the Van Arsdale case or any of the Van Arsdale factors, which don't come into play in the state court's analysis or its conclusion, which is explicitly about just cumulative error, a kind of sufficiency of the error analysis. And third, it doesn't seem to cite or recognize, as the Supreme Court has repeatedly in cases like Bruton and Cruz, the particular devastating impact of a co-conspirator's statement being introduced before the jury, with all of that missing from the state court's analysis. Why isn't it contrary to clearly established federal law? Sure. So first, I think you wanted to sort of talk down, you know, they didn't mention Chapman particularly. And I think it's clear that we look at the judgment of the Superior Court, not necessarily what they said in their opinion. And the question is whether or not their judgment can be, can withstand at the deference. And I think here it certainly can. As to the factors, again, I think it's implicit in what they found. They considered a whole host of things. They looked at the testimony, both of the eyewitnesses, and found them credible. And, of course, that's a determination that this court, despite counsel's invitation for you to do the opposite, that's not something that can be re-reviewed on habeas in epideference. So I would say that they did these things. They may not have spelled it out in their opinion with as much detail as you or I would have liked. But the goal here, the task before you, is to review the judgment of the Superior Court and to determine if that judgment is contrary to clearly established precedent of the United States Supreme Court, which brings me to your point about the devastating co-conspirator statement and pointing to cases like Bruton. Well, Bruton isn't a Confrontation Clause case in a Crawford. It deals entirely with whether or not a statement needs to be redacted. So Bruton and the several other cases associated with Bruton that counsel claims, really, I think, aside from starting a very basic underpinning, aren't applicable to these cases because they don't encompass the same situation that the facts present here. We can consider that and the evidence when it comes to our de novo raft review. But where the state court has actually misstated the test to be applied. I'm not sure that they did misstate it. Well, doesn't the court here say explicitly that the test it's using is based on one factor, cumulativeness? That's what they said, but that doesn't mean that's all they did. And again, you look at the judgment and you see if there's any reasonable way to find that that was not an unreasonable application of Supreme Court precedent. The analysis here is all about cumulative error. And the court's conclusion, quote, we agree with the trial court that Slaughter's statement was merely cumulative to testimony provided by Bowens and Williams. And I would submit that that is sufficient under Brecht. What Brecht asks you to do is look at the entire scope of the trial and say if you take out the piece that was unconstitutional, is what is left so injurious that relief is warranted? And their finding is it was not. There was consistent testimony by both of the eyewitnesses throughout the multi-stages where they interacted with the state. When they gave their statements to the police, when they spoke at the preliminary hearing, when they testified at the first trial, and then again at the second trial. So not only were each of the two eyewitnesses internally consistent with their own stories, but their stories were consistent with one another. And then those two renditions of the facts of the murder were consistent with both the physical evidence from the ME and from the ballistics expert. So I think in saying, look, there was an overwhelming amount of prejudicial, appropriately prejudicial evidence against Johnson, regardless of whether or not there was an opportunity to cross on the statement that he made to the police. We can still find that the effect was minimal. If that's the case, then why was the government's attorney here treating it as so critical to the government's case? I'm sorry to interrupt you. For the jury to see, got slaughtered, a confirmed page by page, his signature, had the police officer read it verbatim into the record and then relied on it in closing. Doesn't that, I mean, the series of facts from the record indicate that it was indeed central from the prosecutor's perspective to the government's case? Well, I think it was convenient that counsel used the words that this was a centerpiece of the closing. In fact, it wasn't. That's just false. The closing argument was 33 pages long, and our use of witnesses, our discussion of those witnesses, we spent 11 pages talking about Brenda's testimony. We spent only 6 pages talking about slaughter's testimony and an additional 7 pages talking about the additional testimony of our other witnesses. So to suggest in closing, as counsel has, that this was the centerpiece of our case, I think, is just an exaggeration of the facts. Certainly it's a useful piece of evidence, and we were going to take advantage of it to the extent that we, defense counsel at trial and the trial judge, all believed that it was a piece of evidence we could properly use, which turned out to be incorrect. Could you address the phone conversations? I heard your question, ma'am. I don't have any record. I'm in the same place as you are, thinking that it was a particularly constructed phone call, or at least the explanation of the phone calls in the closing argument seemed purposefully constructed to give a certain view. But the records I have at this point do not contain any information. Could you comment on the trial judge's statement that slaughter is trying to subvert justice? I mean, it seemed to me that that made the need to cross-examine slaughter all the more important. So I think that may have been confused a bit in the briefing by counsel. Actually, the trial judge did not say that. What happened was, in the roving room, there was a break where there was going to be a sentencing hearing for slaughter. Did you say that the judge did not say that? The judge did not. Those words did not come out of the judge's mouth. They came out of the prosecutor's mouth. He said, and then this statement was read back in open court later, but Mr. Vega said, I think this defendant's attitude in not showing any type of remorse in facts, trying to undermine the truth-seeking process of the Commonwealth, trying to bring some justice. So I believe that because he has stood in the way of this process moving forward, you should sentence him to a higher sentence than the sentence that was vacated earlier because he didn't comply with the deal that we had struck and, in fact, has made this entire thing more difficult. The trial judge just didn't say that. It was the prosecutor making an argument for why a more stringent sentence should be imposed. Was it the prosecutor's view that slaughter should not be cross-examined or was it just slaughter's statement that he didn't want to speak anymore? I'm sorry? Was it the prosecutor's? Did the prosecutor object to the cross-examination? I don't think so. I think the prosecutor would have loved if slaughter had got on the stand and abided by the deal that he had made and submitted fully to examination by both parties. He certainly did submit to some examination to say that he had rejected any questioning. It would be false. He answered several questions and then was equivocal about asserting his privilege. In fact, he didn't actually utter the words, I take the fifth until the second day of questioning. And I think the fact that the trial court went through such significant efforts by calling sidebars and by going into conference in his room to kind of determine what slaughter was trying to do indicates how very equivocal slaughter was about whether or not he was going to answer. He would refuse a couple of questions but then answer ten in a row and then refuse another question and then answer some more questions. So there was not as presented an across-the-board refusal to undergo examination by the prosecutor. It was more a question by question. I'm not going to answer that, but I will answer this, so maybe not that. Slaughter explained away his confession by saying, well, I was really just trying to get him to plead. Correct. Obviously, neither of us did anything, but if he pled, we were okay. And then I realized after the fact when he wasn't going to plead. Oh, my gosh. Oh, my gosh. He said that in front of the jury, did he not? My memory is that he did, yes. And it's also the case that the prosecutor in closing points to that supposed repudiation to show that there's, in fact, an ongoing scheme coordination between the two as to why he was repudiating his statement. That is also my memory, yes, Your Honor. And, again, under Brecht, of course, what happens in closing is in evidence and Brecht requires looking only at the evidence that remained after the unconstitutionally used evidence was introduced. I also wanted to quickly point out under the due process claim, the claim that we haven't been giving most of our attention to here, that counsel suggests that there was no finding by the superior court on the merits, and my reading suggests that that just isn't accurate. The superior court said that we conclude that this is not an improper attempt by the commonwealth to create an inference of guilt. That goes to whether or not the prosecutor was undertaking misconduct by trying to call slaughter. And without a finding of prosecutorial misconduct, you don't have due process violation, and, therefore, you don't need to get to whether there was Brecht prejudice under the due process claim because there was no violation to begin with. Do you agree that even if there's not a stand-alone due process violation, that under Douglas v. Alabama, that's something that can be considered as to the prejudicial effect of a confrontation clause violation? I think if there was a finding that we were trying to sort of garner some sort of, well, you're going to find this sort of an association of guilt situation, but the superior court made a specific finding that that is not what the commonwealth was doing by trying to introduce a statement. We were not trying to have an association of guilt kind of creep its way into the jury's mind. In fact, we were trying to have a direct testimony of guilt. That's why we wanted to call him. And I would also point out that Douglas is really a waiver case, and the facts here are quite similar. The analysis that the Supreme Court undertook was not on these same issues. So Douglas is not really quite as applicable as I think counsel suggested it would be. All right. What is your short version of how we look at the harmless error analysis? Sure. I think Brecht is kind of fuzzy, as most very general standards are. And I think that that, as we've learned, Knowles in particular tells us that where there's a fuzzy standard, you have to be particularly deferential. And so I think what happens here is you look at Edpert Chapman, because there were findings. They did make those determinations, and you see if it meets the basic Edpert requirements. And if the superior court's reasoning was not contrary to, then that's where it ends. Do you agree that in conducting that analysis under Supreme Court precedent, what we need to look at is the application of the Van Oresdale factors? I do. And of those, the only one that seems to be addressed in the state court's opinion is cumulativeness. That's the only one that they addressed in the opinion. That is correct. But again, I would remind you that what they say in an opinion is not what you're looking at. You're looking at the judgment. You're looking at if there was any reasonable way that they could have reached that judgment. And if so, you apply Edpert Chapman to any way either that they expressed or the reasonable minds could come up with. So whether or not it was written on the paper is not really the telling point here. Is it your position that the unreasonable application test has us looking at the analysis or only at the conclusion reached by the court? At the judgment of the court. The determination? The determination. The determination. The finding, but not necessarily what they write about how they got there. There are a whole host of reasons that they may not have written everything down. We can't look into that. That's not a question that we can reasonably answer. So we look at the judgment. We look at what that's what undergoes the analysis. So back to your question, I would say you do have Chapman. Even if that passes, Breck still requires then turning to a review of the entire scope of the evidence. So it's kind of as Judge Rendell suggested, there's not a – I'm sorry, just to quickly finish the question. It doesn't matter if you do it first or second, but both of those components need to happen. Why isn't this – sorry. It's just something – you know, finding that it was cumulative, I mean, the factors listed in Van Arsenal are importance of witness's testimony in the prosecution case, whether it was cumulative, presence or absence of evidence corroborating and contradicting the testimony of the witness. I mean, in assessing the testimony of others, they necessarily had to have thought that the other testimony was sufficient in order to find the cumulative nature. Yes. So I guess I would go back on your statement that cumulative is the only thing they really did. Well, I think it's the only thing they said in so many words. That's just the only thing they did. And again, I would say, you know, Hay and her R&R laid out these four points and did a very nice job of running through why relief still wouldn't be appropriate. How do you distinguish this case from Washington v. Pennsylvania Department of Corrections, where our recent case where we likewise had a testimony of a witness that was highly impeached, but as here, no physical evidence that linked the defendant, and where we concluded that there was actual prejudice? Well, first I would say it's a brutal case, so it's not exactly on point. And second, there was no Edmund Chapman finding there. There was no merits review of the state courts that had to go through that initial stage, whereas there is here. But to the extent, though, that that's a brutal case, doesn't that actually cut the other way in the sense that at least there there was redaction of the defendant's name and there was a limiting instruction? We don't have either of those circumstances here. Well, no, I mean, you wouldn't because that wasn't the claim that they made. I think, generally speaking, it didn't go through that first layer of review of what the state court did and the determination of whether or not that was objectively unreasonable. So I think that makes a huge difference, and you really can't make a fair comparison to Washington. Very good. Ms. Keefer, thank you very much. Thank you very much. Mr. Ranofsky? I'll make three or four quick points. Number one, I've rechecked on Ayala, Judge Rendell, just rechecked the opinion again. Ayala court ruled that a federal habeas court need not formally apply both prongs. Need not formally apply, but what I was reading was the end of that sentence. It says, while it need not formally apply, EDPA nevertheless, quote, sets forth a precondition. And I think that precondition, I think, gets subsumed in the general announcement. Questions, what is subsumed? Judge Fuentes, you asked whether or not the trial judge said that the co-defendant was out to subvert justice. In fact, he used those words. I don't know that the jury heard him, but that was the predicate to the prosecutor then saying, and we've quoted that, about the attempt of the co-defendant to subvert the truth-finding process of the Commonwealth. That gets re-read back to the jury. I mean, that really is piling on. Can you point us to where that is in the record? Yes. Because the June 2nd. Yeah, so page 57. They read the sentencing. But the sentencing is also the prosecutor's decision. You have the sentencing and then it gets re-incorporated. That's right. But the sentencing provision that was read to the jury is on June 2nd, and at page 84 is where the prosecutor makes this point about him trying to subvert justice and the truth-finding process of the Commonwealth. And this is what the court authorizes to be read to the jury, and it goes out as an exhibit. I mean, this whole notion that the prosecutor somehow is helping Mr. Johnson by having. . . But that was as part and parcel of the re-sentencing. But it was. . . And then it was read. . . It was read to the jury. Yeah, in that, but. . . It was read to the jury. It wasn't like, okay, in this case, I mean, at this moment he is. It's a little removed. Right. Two other points. The Superior Court did not say this was not a Fifth Amendment violation. All the Superior Court said was the party seemed to be ignorant of the fact that he had a Fifth Amendment right. They dismissed the Fifth Amendment claim on an erroneous ground. I mean, every court that's looked at it has said you can't use ignorance, whether it's gravy or this kind of situation, to excuse a constitutional violation. That's the only finding the Superior Court made on the Fifth Amendment point. Nothing else. And so, finally, as to the closing argument, the prosecutor says, well, look, they spent seven pages on this. They spent six pages on the witnesses or eight pages on the eyewitnesses. The fact is on the eyewitnesses, they had to fight off all the impeachment material. I mean, that's why they spent a little more pages on that point. But he comes back to the central point. You heard the co-defendant, the convicted co-defendant in this case, point an accusatory finger at Mr. Johnson. That was a central theme of the closing argument, and it's not cumulative. As this court said in Grant v. Lockett, when you have eyewitness testimony, when you have a confrontation clause violation, whether it's a Bruton error or this kind of error, that's not cumulative. Cumulative is when you have four or five eyewitnesses. This isn't cumulative. This is a separate argument for conviction, and Brecht and Aiello both say the issue is, not whether there's remaining evidence that could support the verdict. Sure, remaining evidence could support the verdict. The question for this court under Aiello and Brecht is, did the violation in cumulative effect have a substantial impact on the verdict? Looking at this, how can you say it did not? And that's why the Superior Court was wrong, using even a higher standard, and that's why this court will reverse Washington, Vasquez, Adamson in this court. And if you look at all the decisions of the federal courts over the past two years, we cited a dozen cases in our brief with very similar facts. All the Commonwealth could say is we had a plethora of cases. We cited that this is a constitutional violation. Thank you. Thank you very much. Appreciate it. Yes, indeed. And we'll take the case under advisement.